UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| NEW CINGULAR WIRELESS PCS, LLC a/k/a AT&T,<br>    Plaintiff,<br><br>v.<br><br>CITY OF WEST HAVEN and CITY OF WEST HAVEN, CONNECTICUT PLANNING AND ZONING COMMISSION,<br>    Defendants. | No. 3:11cv1967 (MPS) |

**RULING AND ORDER**

This dispute arises under the Telecommunications Act of 1996 (the "TCA") and illustrates the tension between the federal interest in assuring nationwide access to rapidly evolving wireless technology and local interests in land use regulation. Defendant Planning and Zoning Commission (the "Commission"), on behalf of Defendant City of West Haven (the "City"), denied an application for a special permit submitted by New Cingular Wireless PCS, LLC ("AT&T") to install a personal wireless facility on the rooftop of a neighborhood building that already houses the antennas of many of its competitors. After the special permit was denied in a terse opinion, AT&T filed this nine-count complaint in December 2011, alleging violations of the TCA, the Constitution, and Connecticut law.

Pending before the Court is AT&T's motion for summary judgment, which the Court grants for the reasons that follow. The TCA provides that local governments "shall not unreasonably discriminate among providers of functionally equivalent services." 47 U.S.C. § 332(c)(7)(B)(i)(I). By denying AT&T's permit while allowing its competitors to maintain facilities at the site, Defendants discriminated against providers of equivalent services. And this

discriminatory treatment—though not motivated by animus toward AT&T—nevertheless was unreasonable under the TCA because there was no visual, aesthetic, or safety differences between AT&T's proposed facility and those existing at the site.

## I.    Background

The following facts are taken from the parties' Local Rule 56(a) Statements, affidavits, and exhibits.  The Court presents all facts "in the light most favorable to the non-moving part[ies]"—here, Defendants—after drawing "all reasonable inferences in [their] favor." *Sologub v. City of New York*, 202 F.3d 175, 178 (2d Cir. 2000) (quotation marks omitted).  Additional facts are discussed in the analysis where relevant.

On September 9, 2011, AT&T applied to the Commission for a special permit to install a wireless facility on the building located at 278 Main Street.  (Pl.'s Local Rule 56(a)(1) Statement [Dkt. # 18-2] ¶ 23.)  In an effort to enhance its 4G network, AT&T sought to install twelve antennas on three parts of the rooftop, with ancillary equipment located in an equipment room on the ground floor.  (*Id.* ¶¶ 24-25.)

The building at 278 Main Street, located in the City's "Central Business District," already hosts several wireless facilities maintained by AT&T's competitors.  (*Id.* ¶ 58.)  Verizon maintains a facility that consists of twelve panel antennas pipe-mounted to an equipment cabinet on the rooftop penthouse.  (*Id.* ¶ 5.)  T-Mobile has three rooftop equipment cabinets and six panel antennas.  (*Id.* ¶ 6.)  And Sprint/Nextel operates nine panel antennas and an equipment room.  Verizon, T-Mobile, and Sprint/Nextel's facilities provide services that are functionally equivalent to the services that AT&T seeks to provide.  (*Id.* ¶ 9.)[1]

---

[1] Clearwire also maintains a facility on the roof (Pl.'s Local Rule 56(a)(1) Statement ¶ 8), but AT&T's counsel represented that Clearwire does not provide services that are functionally

All of the existing wireless facilities at 278 Main Street were installed as of right, before the Commission instituted stringent new zoning regulations in early 2011. (*Id.* ¶¶ 5-7, 13, 17.) These new regulations were promulgated after residents expressed concern over the wireless facilities on the building. (*Id.* ¶¶ 11-12.) In early 2010, residents complained to the Commission about the legal status of the wireless facilities at the site. (*Id.* ¶ 11) Acting on these complaints, the Commission attempted to issue cease-and-desist orders requiring the removal of existing antennas, but was rebuffed by Commissioner Eileen Buckheit of the Department of Planning and Development—a separate administrative body—because the wireless facilities were in compliance with the zoning regulations then in force and because Defendant Commission did not have authority to issue such orders. (*Id.* ¶ 12; *see also* Exs. G, H, I, J to Schriever Decl. [Dkt. # 19].) Members of the public appealed Commissioner Buckheit's decision to the Zoning Board of Appeals. (Pl.'s Local Rule 56(a)(1) Statement ¶¶ 15-16.) In addition, members of the public petitioned the City Council to review the actions of the Commission and the Planning and Development Department in approving the existing wireless facilities at the site. (*Id.* ¶ 13.)

This is the context in which the Commission began revising the zoning regulations in late 2010. (*Id.* ¶ 17.) And in fact, some of the residents dissatisfied with the telecommunications equipment at 278 Main Street were involved in the drafting process. In October 2010, the Commission held a meeting at which revisions to the zoning regulations were discussed. The minutes of this meeting reflect a comment by one of the residents active in the campaign to remove the existing wireless antennas from 278 Main Street that he "would like to see no telecommunications placed on any residential property." (Ex. M to Schriever Decl.; *see also* Ex.

---

equivalent to those that AT&T seeks to provide. (Record ("R."), Ex. 16 at 3 ("Clearwire . . . is not really a wireless telephone service provider."); *see also* Defs.' Opp'n [Dkt. #26] at 11 n.6.)

G to *id.* (the speaker is the first signatory to the letter urging Chairman Panza to remove existing antennas).

As one might expect, the new zoning regulations impose numerous requirements on wireless providers seeking to collocate telecommunications equipment. The Court need not catalogue the various new requirements in the code, as they are not material to the analysis. Suffice it to say that since the new zoning regulations took effect, the Commission has approved only one special permit to a wireless service provider, and that one approval was part of a stipulation for judgment in a suit that AT&T brought in relation to its attempt to install a wireless facility at a separate location. (Pl.'s Local Rule 56(a)(1) Statement ¶ 22; Defs.' Local Rule Statement [Dkt. # 23] ¶ 22.)

On November 22, 2011, the Commission issued a Certificate of Decision denying AT&T's special permit request. (Pl.'s Local Rule 56(a)(1) Statement ¶ 30.) Citing the recently revised zoning regulations, the Certificate of Decision provides no explanation aside from the following:

> 1. The application fails to meet the following criteria:
>    a. Section 48.3 Site Selection Policies
>    b. Section 48.5.1 Design Criteria
>    c. Section 48.6.11 Equipment Building Size
>    d. Section 48.6.12 Visual Screening
>    e. Section 48.6.13 Additions to Existing Facilities
>    f. Section 48.7
>       * Opportunities to mitigate possible visual impact
>       * Preservation of views, corridors, vistas
>       * Potential for preservation of pre-existing character of site

(Ex. D to Schriever Decl.) Shortly thereafter, AT&T brought the present suit.

## II. Legal Standards

Summary judgment is appropriate only when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.

R. Civ. P. 56(a). The moving party—here, AT&T—bears the burden of demonstrating that no genuine issue exists as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986). "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (quotation marks omitted). "The substantive law governing the case will identify those facts that are material, and only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55, 59 (2d Cir. 2006) (alterations and internal quotation marks omitted).

If the moving party carries its burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011).

### III. Discussion

#### A. The TCA

Enacted in 1996, the TCA is "an omnibus overhaul of the federal regulation of communications companies." *Cellular Tel. Co. v. Town of Oyster Bay*, 166 F.3d 490, 492 (2d Cir. 1999). According to the Conference Committee, the purpose of the TCA was

> to provide for a pro-competitive, de-regulatory national policy framework designed to accelerate rapidly private sector deployment of advanced telecommunications and information technologies and services . . . by opening all telecommunications markets to competition.

*Sprint Spectrum L.P. v. Willoth*, 176 F.3d 630, 637 (2d Cir. 1999) (quoting H.R. Rep. No. 104-458 at 206 (1996) (Conf. Rep.), *reprinted in* 1996 U.S.C.C.A.N. 124, 124)). "In furtherance of this goal, Congress added" 47 U.S.C. § 332(c), the statutory provision that is at issue in this suit. *Town of Oyster Bay*, 166 F.3d at 493.

Section 332(c)(7) "strikes a balance between two competing aims—to facilitate nationally the growth of wireless telephone service and to maintain substantial local control over siting of towers." *Omnipoint Commc'ns, Inc. v. City of White Plains*, 430 F.3d 529, 531 (2d Cir. 2005) (internal quotation marks omitted). To do so, § 332(c)(7) has a two-part structure whereby subparagraph (A) preserves state and local zoning authority subject to five express limitations on local zoning authority that are enumerated in subparagraph (B), *see* 47 U.S.C. §§ 332(c)(7)(B)(i)-(v). In relevant part, the statute provides as follows:

> (7) Preservation of local zoning authority
>
>> (A) General authority
>> Except as provided in this paragraph, nothing in this chapter shall limit or affect the authority of a State or local government or instrumentality thereof over decisions regarding the placement, construction, and modification of personal wireless service facilities.
>>
>> (B) Limitations
>> (i) The regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof—
>>
>>> (I) shall not unreasonably discriminate among providers of functionally equivalent services; and
>>>
>>> (II) shall not prohibit or have the effect of prohibiting the provision of personal wireless services.
>>
>> (ii) A State or local government or instrumentality thereof shall act on any request for authorization to place, construct, or modify personal wireless service facilities within a reasonable period of time after the request is duly filed with such government or instrumentality . . . .
>>
>> (iii) Any decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record.
>>
>> (iv) No State or local government or instrumentality thereof may regulate the placement, construction, and modification of personal wireless service facilities on the basis of the environmental effects of radio frequency

6

        emissions to the extent that such facilities comply with the Commission's regulations concerning such emissions.

47 U.S.C. § 332(c)(7).

    AT&T argues that by refusing to approve its application to collocate its wireless facility at 278 Main Street, the City violated many of the express limitations enumerated in § 332(c)(7)(B) of the TCA.  (*See* Pl.'s Mem. of Law [Dkt. # 18-1] at 1-5.)  Among these claimed TCA violations, AT&T asserts that the City unreasonably discriminated against it in violation of subsection (B)(i)(I).[2]  As the Court agrees that the City's denial of AT&T's permit application constituted unreasonable discrimination under the TCA, and because this conclusion provides a sufficient basis for the Court to award full relief, the Court need only address the unreasonable discrimination claim.

    **B.**    **Unreasonable Discrimination**

    Subsection (B)(i)(I) prohibits local governments and instrumentalities from "unreasonably discriminat[ing] among providers of functionally equivalent services." § 332(c)(7)(B)(i)(I).  The Second Circuit made clear in *Willoth* that there are two distinct questions to consider when assessing whether a locality's actions run afoul of the anti-discrimination provision embodied in § 332(c)(7)(B)(i)(I): (1) whether the locality's treatment of a wireless provider's application to site its facility was discriminatory among

---

[2] AT&T also alleges that the City and the Commission (1) violated § 332(c)(7)(B)(i)(II) because the permit denial prohibits or has the effect of prohibiting the provision of personal wireless services in the area; and (2) violated § 332(c)(7)(B)(iii) by issuing a written denial that did not include any record bases for the denial and was unsupported by substantial evidence.  In addition, AT&T brings claims under other federal and state provisions, asserting that Defendants (1) violated the dormant Commerce Clause because several sections of the zoning regulations place substantial burdens on interstate commerce that exceed any putative local benefit; (2) violated the Due Process and Equal Protection Clauses of the Fourteenth Amendment; (3) violated various state statutory provisions; and (4) violated Section 6409 of the Middle Class Tax Relief and Job Creation Act of 2012.  (Pl.'s Mot. for Summ. J. [Dkt. # 18] at 1-3; Pl.'s Supp. Br. [Dkt. # 38] at 2-10.)

providers of functionally equivalent services, and (2) if so, whether the discrimination was *unreasonable*. *See Willoth*, 176 F.3d at 638-39 (assuming that the defendant–planning board's actions were discriminatory but concluding that they were reasonable); *id.* at 638 (noting that the TCA "explicitly contemplates that some discrimination . . . is allowed" and that the "discrimination need only be reasonable"). The *Willoth* court examined the following legislative history of the TCA to understand the scope of the prohibition against "unreasonable discrimination":

> [T]he phrase "unreasonably discriminate among providers of functionally equivalent services" will provide localities with the flexibility to treat facilities that create different visual, aesthetic, or safety concerns differently to the extent permitted under generally applicable zoning requirements even if those facilities provide functionally equivalent services. For example, the conferees do not intend that if a State or local government grants a permit in a commercial district, it must also grant a permit for a competitor's 50-foot tower in a residential district.

*Id.* at 639 (alteration in original) (quoting H.R. Conf. No. 104–458, at 208, reprinted in 1996 U.S.C.C.A.N. at 222). By implication, localities do *not* have the flexibility under subsection (B)(i)(I) to treat wireless facilities differently to the extent they create the *same* visual, aesthetic, or safety concerns. *See Sprint Spectrum L.P. v. Town of Easton*, 982 F. Supp. 47, 51 (D. Mass. 1997).

        **1.**    **First Prong of *Willoth*: Discrimination among Providers of Functionally Equivalent Services**

In this case, there is no genuine dispute that Defendants "discriminate[d] among providers of functionally equivalent services" by denying AT&T's request for a special permit to install its facility on the rooftop at 278 Main Street. Verizon, T-Mobile, and Sprint/Nextel—all "providers of functionally equivalent services"—already maintain wireless facilities on the

8

rooftop.  (Pl.'s Local Rule 56(a)(1) Statement ¶¶ 5-9.)[3]  Allowing AT&T's competitors to maintain wireless facilities while prohibiting AT&T from doing so is plainly discrimination.

Defendants argue that denying AT&T's special permit request did not constitute discrimination, because the Commission was simply implementing in an even-handed manner the new zoning regulations that went into effect in 2011.  In other words, the apparent difference in treatment, according to their argument, is the product of the Commission's nondiscriminatory application of two different legal regimes: the pre-2011 as-of right regime and the post-2011 zoning regulations.  (*See* Defs.' Opp'n at 12 ("There is no factual basis to conclude that the Commission treated AT&T unequally vis-à-vis the other carriers, as the regulations governing their respective applications were entirely different.").)  This argument fails because it rests on the erroneous assumption that the prohibition against discrimination in subsection (B)(i)(I) is an intent-based, rather than effects-based, standard.

Although the language of subsection (B)(i)(I) is ambiguous as to whether the prohibited discrimination should be measured by intent or effect,  *see* § 332(c)(7)(B)(i)(I) ("The regulation of the placement, construction, and modification of personal wireless service facilities . . . shall not unreasonably discriminate among providers of functionally equivalent services."), an effect-based standard of discrimination better comports with the overall context and purpose of the statute.  *See Castellano v. City of New York*, 142 F.3d 58, 67 (2d Cir. 1998) ("Where the language is ambiguous, we focus upon the broader context and primary purpose of the statute." (internal quotation marks omitted); *see also Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997) (statutory construction focuses on "the language itself, the specific context in which that language is used, and the broader context of the statute as a whole").  As the Second Circuit has

---

[3] *See supra* note 1 (noting that Clearwire also maintains a wireless facility but does not provide functionally equivalent services).

recognized, one of the central purposes of the TCA is to foster competition among wireless providers by creating a deregulated policy framework. *See Willoth*, 176 F.3d at 637 (quoting legislative history saying that a chief purpose of the TCA is "to provide for a pro-competitive, de-regulatory national policy framework designed to accelerate rapidly private sector deployment of advanced telecommunications and information technologies and services . . . by opening all telecommunications markets to competition"). Interpreting subsection (B)(i)(I) to prohibit local regulation with discriminatory effects furthers the statutory purposes of promoting competition and fostering rapid deployment of technology—more so than would a narrower, intent-based interpretation, which would create greater proof obstacles, bog down the enforcement of wireless providers' statutory right to prompt consideration of their proposals to build wireless facilities, and, in this case, impede competition. *See* 47 U.S.C. § 332(c)(7)(B)(ii) (requiring action by state and local governments on requests regarding placement or modification of personal service facilities "within a reasonable period of time"). Such an interpretation is also consistent with case law applying subsection (B)(i)(I). For example, in *Sprint Spectrum L.P. v. Town of Farmington*, the district court found that a nine-month moratorium on new telecommunications antenna facilities was unreasonably discriminatory in violation of the TCA, even though the moratorium applied to all wireless providers and thus likely was not *intended* to discriminate between them. No. 3:97 CV 863 (GLG), 1997 WL 631104, at *1, *6 (D. Conn. Oct. 6, 1997). Like the new zoning regulations here, the moratorium in *Farmington* applied to all wireless carriers, but this fact alone did not mean it was non-discriminatory under the TCA. *Id.*

Because subsection (B)(i)(I) prohibits local regulations that have unreasonable discriminatory effects, Defendants' argument that they even-handedly applied the new zoning

regulations falls short.  Although there is no evidence in the record that the Commission applied its new regulations in a discriminatory fashion, the regulations themselves make the installation of further wireless facilities much more difficult and cumbersome.  Even if the Commission enforced the regulations uniformly against all wireless providers, the effect of the regulations in this case was to discriminate in favor of wireless providers that have existing wireless facilities and against providers that do not.

### 2. Second *Willoth* Prong: Unreasonable Discrimination

Showing discrimination is not, however, tantamount to showing a violation of the TCA; AT&T must demonstrate that the discrimination was *unreasonable*.  *See Willoth*, 176 F.3d at 638 ("The [TCA] explicitly contemplates that some discrimination . . . is allowed.  Any discrimination need only be reasonable." (alterations omitted)).  Localities may reasonably discriminate between facilities to the extent that they "create different visual, aesthetic, or safety concerns."  *Id.* at 639 (quoting H.R. Conf. No. 104–458, at 208, *reprinted in* 1996 U.S.C.C.A.N. at 222); *see also Smart SMR of N.Y., Inc. v. Zoning Comm'n of Town of Stratford*, 995 F. Supp. 52, 59 (D. Conn. 1998) ("According to the legislative history, a zoning authority may consider factors such as visual, aesthetic, or safety concerns."); *Town of Easton*, 982 F. Supp. at 51 ("[L]ocal Boards have discretion to treat facilities differently *only* [insofar] as they create different visual, aesthetic, or safety concerns to the extent permitted under generally applicable zoning requirements." (emphasis added and alterations omitted)).

Such bases for "reasonable discrimination" are difficult to discern, however, when the proposed new facility would be built at a location that already houses a competitor's facility.  As a result, courts often find violations of subsection (B)(i)(I) when localities deny permits to wireless providers who seek only to "co-locate" at an existing telecommunications site.  *See,*

11

*e.g.*, *Omnipoint Commc'ns, Inc. v. Town of LaGrange*, 658 F. Supp. 2d 539, 561 (S.D.N.Y. 2009) ("[B]y wrongfully denying T-Mobile's application to co-locate at the same location and preventing T-Mobile from providing wireless services that are functionally equivalent to those provided by Nextel, the Town has unreasonably discriminated against T-Mobile in violation of the TCA."); *T-Mobile N.E. Inc. v. Inc. Vill. of E. Hills*, 779 F. Supp. 2d 256, 273-74 (E.D.N.Y. 2011) (finding unreasonable discrimination where the plaintiff–wireless provider sought to install eight antennas on a facility already housing the antennas of two of its competitors); *MetroPCS N.Y., LLC v. City of Mount Vernon*, 739 F. Supp. 2d 409, 423-24 (S.D.N.Y. 2010) (finding unreasonable discrimination where the plaintiff–wireless provider sought to collocate its facility on a rooftop housing three of its competitors' facilities); *Nextel Partners, Inc. v. Town of Amherst*, 251 F. Supp. 2d 1187, 1194-95 (W.D.N.Y. 2003) (finding unreasonable discrimination where the plaintiff–wireless provider sought to install antennas on an existing tower housing three of its competitors' facilities). After all, it is rare that facilities at the same location will generate different "visual, aesthetic, or safety concerns" that would justify treating wireless providers differently. *Willoth*, 176 F.3d at 639 (quoting H.R. Conf. No. 104–458, at 208).[4]

Defendants argue that the denial was based on aesthetic reasons. (Defs.' Opp'n at 13-15.) Although aesthetics can be "a permissible ground for denial of a permit under the TCA," *Omnipoint Commc'ns, Inc. v. City of White Plains*, 430 F.3d 529, 533 (2d Cir. 2005), the record does not support Defendants' contention that the Commission reasonably denied AT&T's special permit on the basis of its visual impact at the site. First, the rooftop has thirty antennas on it

---

[4] The Court does not mean to suggest that a locality's prohibiting a wireless facility at a location that already hosts a competitor's facility always constitutes unreasonable discrimination in violation of the TCA. As the *Willoth* court observed, "it is not unreasonably discriminatory to deny a subsequent application for a cell site that is substantially more intrusive than existing cell sites by virtue of its structure, placement or cumulative impact." *Willoth*, 176 F.3d at 643.

already, and in assessing the aesthetic impact of the proposal, the Commission was entitled to consider only the *marginal* change in the appearance of the building. *See Smart SMR*, 995 F. Supp. at 59 ("[The wireless provider] merely sought to modify the Existing Tower. General aesthetic and visual concerns are therefore only an issue with regard to the *modifications* to the Existing Tower, and not the Existing Tower itself." (emphasis added)). Visual images in the record show a rooftop already bristling with antennas—a blight on the skyline that has evoked blunt comments from residents. (*See* Letter from Residents to Chairman Panza dated Mar. 7, 2010, Ex. G to Schriever Decl. (stating that rooftop "is ugly – you've seen the pictures").) Second, AT&T submitted ample evidence that its proposed facility would not make the rooftop any more of an eyesore than it already is. In fact, AT&T submitted photo-simulations demonstrating that, unlike the existing wireless facilities, its antennas will be concealed within enclosures textured and painted to match the building's façade. (*See* Pl.'s Local Rule 56(a)(1) Statement ¶¶ 24, 63; R., Ex. G. (photo-simulations).)

The evidence cited by Defendants in response is insufficient to create a genuine dispute about the aesthetic impact of AT&T's proposal.[5] In their Local Rule 56(a)(2) Statement, Defendants deny that the proposed facility "would have virtually no aesthetic impact," citing two portions of the hearing transcripts before the Commission. (Defs.' Local Rule 56(a)(2)

---

[5] Courts do not uncritically defer to the aesthetic opinions expressed by local zoning authorities. For example, in *Smart SMR*, the district court, finding unreasonable discrimination, did not shy away from making the aesthetic judgment that "modifications to the Existing Tower would complement the neighborhood's character, more so than did the Existing Tower's windmill." 995 F. Supp. at 59. Abject judicial deference to the professed aesthetic tastes of local zoning officials would defeat the TCA's pro-competitive and technology-expanding purposes: an official would need only to state her subjective distaste for a proposal to create a legitimate basis for blocking it. The Court must thus independently evaluate the evidence that underlies statements about aesthetics—that is, there must be evidence in the record that reasonably supports the conclusion that a proposed wireless facility would create an eyesore.

Statement ¶ 63.)[6]  Neither of these portions of the record creates a triable issue regarding the aesthetic impact of AT&T's proposal.  The first is from the October 11, 2011 hearing on AT&T's special permit request.  At the hearing, the Commissioners reviewed the photo-simulations (*see* R., Ex. G), asked questions about the overall height of the proposed installations, and suggested that the eight-foot enclosures are almost the height of a new story on the building.  (R., Ex. 6 at 8-11.)  This colloquy adds nothing to the underlying photo-simulations, which speak for themselves; nor does it address the point that AT&T's proposed facility would work only a marginal change to a rooftop already laden with telecommunications equipment.  Defendants' second citation similarly adds no objective evidence that the proposed installation would be unseemly.  The referenced section is the transcript of the November 22, 2011 hearing, and includes a conclusory observation by Commissioner Panza that "I look at the building and I can see adverse visual affects [sic]."  (R., Ex. 16 at 10.)[7]

---

[6] Defendants also observe that "AT&T changed the specifications for its proposed facilities subsequent to it[s] submission of the Ex. G photo-simulations." (Defs.' Local Rule 56(a)(2) Statement ¶ 63.)  This statement is true, but the modifications scaled down the planned installation, so the photo-simulations, if anything, *overestimate* the aesthetic impact of the proposed wireless facility. (*See* R., Ex. 8 (notifying the Commission that AT&T was "lowering the height of the antennas").)  As such, AT&T's photo-simulations present a "worst-case scenario" with respect to visual impact, and these depictions make clear that it would be unreasonable to characterize the proposed facility as negatively affecting the aesthetics of the rooftop.

[7] The cumulative effect of additional antennas can constitute a valid aesthetic consideration. *See Willoth*, 176 F.3d. at 643.  The photo-simulations make clear, however, that no such impact is present here, because the proposed façade shields AT&T's antennas from view, in contrast with the existing antennas.  Further, Defendants cite nothing in the record that suggests that the Commission believed that there would be a cumulative effect from AT&T's antennas. (*See* Defs.' Opp'n at 12-13 (offering no citation to the record to support the claim that "the Commission was justifiably concerned with the adverse cumulative impact of adding 12 antennas in three sectors on the penthouse rooftop")).

Put simply, there is no evidence that AT&T's proposed facility would impair the aesthetics of 278 Main Street. The rooftop is already "ugly"—to quote the residents who unsuccessfully sought to remove the existing facilities—and AT&T's proposal includes a brick façade to mitigate any additional aesthetic harm. The Commission therefore unreasonably discriminated against AT&T in violation of subsection (B)(i)(I) when it denied its special permit request.

### C. Remedy

The only task that remains is to determine the appropriate remedy. "Courts have consistently held that a mandatory injunction is an appropriate remedy for violations of the TCA." *Town of Amherst*, 251 F. Supp. 2d at 1200. Although the TCA does not specify a remedy, the Second Circuit has observed that "the majority of district courts that have heard these cases have held that the appropriate remedy is injunctive relief in the form of an order to issue the relevant permits." *Town of Oyster Bay*, 166 F.3d at 497. The Commission's past treatment of the application suggests that remand would only result in further unnecessary delay. The Court will therefore order Defendants to issue AT&T the relevant permits to allow it to install its wireless facility as proposed.

The Court's decision to issue a mandatory injunction is buttressed by the enactment of Section 6409 of the Middle Class Tax Relief and Job Creation Act of 2012, Pub. L. 112-96, 126 Stat. 156 (Feb. 22, 2012). This law makes AT&T's entitlement to collocate its wireless facility at 278 Main Street even clearer, providing that a "State or local government may not deny, and shall approve, any eligible facilities request for a modification of an existing wireless tower or base station that does not substantially change the physical dimensions of such tower or base station." 47 U.S.C. § 1455. As AT&T argues in its supplemental brief on the issue, there does

15

not appear to be a genuine dispute about any of the facts material to the application of this section: (1) the building is a base station, (2) the request does not substantially change its physical dimensions, and (3) AT&T's request constitutes an "eligible facilities request" because it seeks to collocate new transmission equipment. (Pl.'s Supp. Br. at 2-10.) Section 6409 has no direct application here because it does not have retroactive effect, for the reasons offered in Defendants' Supplemental Memorandum of Law [Dkt. # 37]. But Section 6409 is further evidence of a clear congressional policy demanding the prompt removal of locally imposed, unreasonably discriminatory obstacles to modifications of existing facilities that would further the rapid deployment of wireless technology; Congress has directed that state and local governments "may not deny, *and shall approve*," qualifying requests for such modifications. 47 U.S.C. § 1455. Congress' recent statement on this issue further supports a remedy that will ensure speedy approval of AT&T's long-pending permit application.

### IV.    Conclusion

For the reasons stated above, Plaintiff's Motion for Summary Judgment [Dkt. # 18] is GRANTED. Defendants are HEREBY ORDERED to grant AT&T's special permit application and issue any ancillary permits that may be required. The Clerk is directed to close this file.

IT IS SO ORDERED.

  /s/
Michael P. Shea, U.S.D.J.


Dated:      Hartford, Connecticut
            July 9, 2013